UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA,            :

  -v-                                                        :          S2 05 Cr. 1157 (LAK)

RAHEEN DAVIS,                                    :
       a/k/a "Dice",

      Defendant.
------------------------------------------------------------x


# DEFENDANT DAVIS MEMORANDUM OF LAW
# IN SUPPORT OF MOTION FOR JUDGMENT OF
# ACQUITTAL OR FOR A NEW TRIAL


                MITCHELL DINNERSTEIN, ESQ.
                Attorney for Defendant Davis
                350 Broadway, Suite 700
                New York, New York 10013
                (212)-925-0793


TO: Katherine Lemire, AUSA
    John Hillebrecht, AUSA
    United States Attorney
    Southern District of New York
    One St. Andrews Plaza
    New York, New York 10007

## MEMORANDUM OF LAW IN SUPPORT OF POST-TRIAL MOTIONS

Defense counsel Mitchell Dinnerstein respectfully submits this memorandum of law, on behalf of Raheen Davis, on June 3, 2008, in support of this Motion for a Judgment of Acquittal or alternatively for a New Trial on 18 U.S.C. § 1951 (Conspiracy to Rob an Individual of Narcotics and Narcotics Proceeds)(Count One) and 18 U.S.C. § 924c (Possession of a Firearm in Furtherance of Count One which was Discharged)(Count Three).  The defendant was convicted of these counts on May 14, 2008.  The Court declared a mistrial on defense counsel's motion regarding Count Two on May 15, 2008.  The mistrial was granted on Count Two 18 U.S.C. § 924(j)(Possession of a Firearm and in the Course of Count One Caused the Death of a Person through the Use of a Firearm)(Count Two) because the jurors were unable to reach a unanimous verdict.

## PRELIMINARY STATEMENT

Raheen Davis was first indicted by himself on November 2, 2005 in a three count indictment for a Hobbs Act Robbery  18 U.S.C. § 1951 (b)(1), and the firearms charges under18 U.S.C. § 924(j) and 18 U.S.C. § 924c.  There were subsequent superceding indictments filed first in February, 2007, then in February, 2008, adding different co-defendants, Lafonso Mitchell and Otis Austin.  Mitchell and Austin wound up being cooperating witnesses for the Government.

This motion addresses whether the evidence presented against Raheen Davis was 1) sufficient as a matter of law to sustain the conviction and 2) whether the Court's and the

1

Government's interruption of defense counsel's summation and the comments made by the Court and the Government led to an impermissible shifting of the Government's burden of proving the defendant guilty beyond a reasonable doubt (TT1098-1099)[1].

As to the first point, defense counsel argues that the testimony against Mr. Davis does not support the guilty verdict beyond a reasonable doubt as required by law. Therefore, this Court should grant a Rule 29 motion for a Judgment of Acquittal on Counts I and III as well as a Judgment of Acquittal on Count II (the mistrial count) . As to the second point, the Court should grant a Rule 33 motion granting the defendant a New Trial on both Counts.

## ARGUMENT

A motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29 requires the Court to determine whether any reasonable jury, when viewing the evidence in a light most favorable to the Government, might find guilt beyond a reasonable doubt. See, USA v. Gotti, 457 F. Supp. 2d 403,405 (S.D.N.Y. 2006). An acquittal must be granted pursuant to Rule 29 if the evidence is insufficient to support a conviction. Id. Alternatively, a new trial may be granted pursuant to Fed. R. Crim. P. 33. Under Rule 33, the Court has broader powers than it does in determining a motion for acquittal because Rule 33 "confers broad discretion upon a trial court to set aside a verdict and order a new trial in order to avert a perceived miscarriage of justice". USA v. Nektalov, 2004 WL2389826 (S.D.N.Y. 2006). A trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant of a motion for a judgment of acquittal pursuant to Rule 29. USA v. Sanchez, 969 F. 2d. 1409 at 1404 (2nd Circ. 1992).

---

[1] TT refers to page numbers of the trial transcript in USA v. Raheen Davis, 05-cr-1157(LAK)

The defense respectfully submits that for the reasons set forth this Court should grant the defendant's Raheen Davis's motion for acquittal as to all counts of conviction due to the insufficiency of evidence to prove the defendant's guilt beyond a reasonable doubt.  In the alternative, the defendant Raheen Davis moves for a New Trial due to the Court's improperly informing the jury that the defendant had the "same right to call Detective Killen as the Government and was free to do so" (TT-1099) Then, the defense commented on the Government's failure to present any cell phone evidence consistent with the Government proof obligations.  The Government objected to the argument and the Court sustained the objection instructing the jury that the "defense has the same right to subpoena cell phone records as the government".  (TT p. 1099)  Such comments near the conclusion of the defense summation impermissibly shifted the Government's burden of proof to the defense.  Moreover, for the Court to state that the defense had the "same right" to subpoena records suggests that the defense would know the appropriate records to subpoena from the cooperating witnesses.  The defense, in fact, was totally unaware of who the phone subscribers were.

## POINT 1

### Conspiracy to Commit a Robbery–Count One 18 USC 1951(b)(1) was not Proven Beyond A Reasonable Doubt

With respect to Count One, the defendant submits that the Government's evidence at trial was insufficient to prove that Davis agreed to participate in a conspiracy to commit a robbery of an individual of narcotics and narcotics proceeds.  There was no evidence presented at trial that supported that there was any conspiracy to rob  "narcotics or narcotics proceeds".

The evidence at trial of the robbery consists of the trial testimony from the victims of the

3

case, Rene Hunter and Quincy Fields and the three cooperating witnesses Lafonso Mitchell, Otis Austin and Rigoberto Ramos. None of these witnesses support the view that the purpose of the robbery was to steal "narcotic and narcotic proceeds".

Rene Hunter testified regarding what the goal of the robbery was as indicated by the perpetrators:

> Q: by Mr. Dinnerstein: Now, other that the person who said, where's the money did that person say anything else?
>
> A: No.
>
> Q: The only words that were spoken was, where's the money?
>
> A: Yes.
>
> TT- p 148 (lines 14-18)

Quincy Fields when asked about the statements of the perpetrators stated in similar fashion:

> Q by Mr. Dinnerstein: Now did the men say– you said only one man did the talking?
>
> A: One man asked, where is the money? And Henry said, I don't have any money. But he threw that (sic) he had in his pocket on the ground.
>
> Q: And that is the only thing you remember being said, where's the money, is that correct?
>
> A: Yes
>
> (TT pp.893 line 22- 894 line 4)

While the three cooperating witnesses each claim that the purpose of the conspiracy was

to steal "money and weed" no reference is ever made to narcotics as defined by 21 USC § 802(17).

    Mitchell testified:

> Q: by Mr. Hillebrecht: And after the name of Henry King was mentioned, what is the next thing that was said, and who said it?
>
> A: Well Rigo [Ramos] said, yeah, I could go up there and rob Henry King and Raheen asked him a couple of questions. Rigo left and Raheen said he will be back.
>
> (TT pp. 253 line 18-254 line 3)

    On cross examination, Mitchell testified about Ramos's role in setting up the robbery of King and the expected proceeds of such a robbery:

> Q: by Mr. Dinnerstein: . . . Rigo is the one who brought up that King had money, is that correct?
>
> A: Yes.
>
> Q: And when he meant "money", did he mean like selling nickle bags of marijuana money?
>
> A: Yes.
>
> Q: You figured that is what he had?
>
> A: He figured if we needed some money, we could go rob King.
>
> (TT pp.413 lines 8-15)

    Austin's version of the event is different. He claims that Davis and Mitchell were together when they approached Austin with the plan to steal from King. Ramos was not there.

> Q: by Hillebrecht: ... Who said what about robbing Henry King?
>
> A: Well, Raheen said he needed me to come with him to hold him down to rob King in the building, and Mitchell was with him.

5

> Q: You say Mitchell was with him?
>
> A: Yes.
>
> . . . .
>
> Q: And did Mr. Davis and Mr. Mitchell tell you what it is they intended to rob?
>
> A: Yes. Money and weed.
>
> (TT p. 564 lines 1-6, p. 564 lines 11-15)

Only later did the three of them, Davis, Mitchell and Austin meet Ramos in his apartment and discussed that they would leave the weapon with him after the robbery of King (TT p. 565 lines 11-14).

Mitchell claimed that during the robbery, the questions asked dealt with the theft of "money and drugs".

> Mitchell testified:
>
> Q: by Mr. Hillebrecht: And during the entire time you were in the apartment, tell us what you heard the defendant say.
>
> A: He asked for the money and the drugs.
>
> Q: Did you hear him say anything else.
>
> A: No.[2]
>
> (TT p. 275 lines 9-13)

Austin testified first that both Mitchell and Davis spoke and that they spoke of "money and weed".:

---

[2] While Mitchell claims to have heard the word "drugs", this testimony contradicts every other eyewitnesses' testimony. Furthermore, King was a "marijuana dealer" and if the term "drugs" was used (highly unlikely), it refers to marijuana and not narcotics as defined by 21 USC §802(17).

> Q; by Mr. Dinnerstein: Now you say, sir, you were able to hear what people were saying, is that correct?
>
> A: Yes
>
> Q: And you say that both Mitchell and Davis said something:
>
> A: They were telling them to give them the money. Give them the money.
>
> Q: Is that what they said, give them the money, or did they say give them the weed or did they say something else?
>
> A: Give them the money and the weed, give me the stuff. Give me everything. That's what they said.
>
> (TT p. 659 lines 13-22)

Ramos claimed to have not agreed to participate in the robbery. He claims that his role was only to hide the weapon afterwards.

> Q: (by Ms. Lemire) So now described what happened once the three of them, Dice, Fonzo and Pop, entered the apartment.
>
> A: Well, they come straight into my bedroom. I was laying on my bed, and Pop asks me, do I want to go punish some work, like come on, let's go punish some work.
>
> Q: What did you take that to mean?
>
> A: I take that as let's go rob somebody, let's go do something, you know.
>
> Q: What do you think meant that?
>
> A: Because that's how we used that term in my neighborhood, that's how we talk.
>
> Q: So how did you respond?
>
> A: Told him, naw, I told him I'm good. So he jokingly, he jokingly was like, oh you pussy, you pussy. Excuse me. That's what he was saying like.
>
> (TT p. 744 lines 4- 18)

7

Ramos claims that he did not agree to the plot to rob and never went to the 12th floor where King was murdered. His only participation in the crime was to take the murder weapon when he felt coerced to do so by Mitchell and Davis.

> Q: Tell the jury what happened when they (Lafonso, Dice and Pop) returned to your apartment.
>
> A: They returned. They came in my apartment. As they was coming in, they were taking the ski masks off. Pop — "they" being Pop, Dice and Fonzo. They took the ski masks off, walked into my bedroom. I walked in behind them. The right I was telling them, yo you got to leave my apartment.
>
> Dice had the gun in hand. Fonzo told me — Fonzo told me, yo, if you tell anybody I am going to kill you. I'm going to kill you. I said, Yo, you all got to leave my house. Dice tells me, you have to hold this for me.
>
> So I take the gun — I take the gun from Dice. We put it under my mattress. At the same time, Fonzo passes me a silver beebee gun that he had also. He put that under my mattress too.
>
> (TT p. 747 lines 7-22)

Ramos lived in the building where the murder occurred and best knew the victim Henry King. He was most aware that King dealt with marijuana and not any other narcotic drug.

> Q: (by Mr. Dinnerstein) Henry King is somebody who sells nickle bags of marijuana, isn't that correct?
>
> A: Yes.
>
> Q: And you know him as selling nickle bags of marijuana, isn't that correct?
>
> A: Yes.

It is crystal clear from all the evidence that King was a marijuana dealer. He did not traffic in other narcotics. The question presented is whether the instant indictment referring to "narcotic and narcotic proceeds" satisfies each of the elements of this indictment. This Court's

memorandum and order filed on May 13, 2008, in all due respect, does not address the statutory definitions of the relevant terms clearly spelled out in the Federal Criminal Code and Rules.

"Narcotic drug" is defined in 21 USC § 802(17) in pertinent part:

> The term "narcotic drug" means any of the following whether produced directly or indirectly by extractions from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:
>
> A. Opium, opiates or derivatives or opium ....
>
> B. Poppy straw and concentrate of poppy straw.
>
> C. Coca leaves....
>
> D. Cocaine ....
>
> E. Ecgonine ....
>
> F. Any compound, mixture, or preparation which contains any quantity of any of the substances of subparagraph (A) through (E).

"Marijuana" is defined in 21 USC § 802(16) in pertinent part.

> All parts of the plant Cannibis stavia L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant and every compound, ...derivative of such plant.

In the defendant's Rule 29 Motion at the completion of the Government's case, the Court cited the definition of the term "narcotic" as defined by the Merriam-Webster Dictionary and the Oxford English Dictionary.[3]  The defense requested that 21 §USC 802(17) be provided to the jury. (TT p. 1014)  The Court refused to provide any guidance to the jury as to the meaning of "narcotics and narcotic proceeds" even though the term "narcotic drug" is defined by the Federal

---

[3] The Oxford English Dictionary defines "narcotic" very broadly as the Court noted. Certainly, by that definition alcohol, caffeine (in coffee) and nicotine (in tobacco) will certainly fit as "narcotic drugs".

Code. This Court, instead, cited State v. Ringo, 246 A. 2d 208, 210 (Conn. Cir 1968[4]). In Ringo, the Connecticut court was defining a State statute, the Connecticut Uniform State Narcotic Drug Act General Statutes c. 344, in effect when Ringo was decided in 1968.  In this case, this Court also has a definition section applicable, that is, 21 USC § 802(17). Failure to provide guidance to the jury by providing the section was error. It should also be noted that the jury sought a dictionary (Court Exhibit D, TT, p. 1207)  We, of course, do not know what term the jurors were concerned about, but certainly it is reasonable to believe that the term would have been "narcotic".

      The Court also indicated that at best the proof at trial was a "variance" and not a "constructive amendment" of the indictment. The seminal Supreme Court case Stirone v. United States, 361 US 212 (1960) indicates that the evidence at trial cannot be broadened through amendment. When the evidence at trial presented a version of the events broader than the indictment, the conviction cannot stand. See, United States v. Weiss, 752 F. 2d 777, 787 (2nd Cir. 1985); United States v. Zingaro, 858 F. 2d 94 (2nd Cir. 1988)  In the instant case, the indictment charging "narcotics and narcotic proceeds" cannot be made synonymous with "marijuana and marijuana proceeds" the proof established by the evidence. Although the Court refused to charge the jury that "narcotics and narcotic proceeds" was not an element of the crime  (TT p. 1013,1014),  it certainly required the Government to prove the alleged proceeds of the robbery beyond a reasonable doubt. Constructive amendments is a *per se* violation of the grand jury clause of the Fifth Amendment. Therefore, there is no need to find "prejudice" as there will be in

---

[4] The Connecticut Circuit Court is an intermediary court in Connecticut similar to our Appellate Division courts.

cases containing a mere variance.  See, United States v. Patino, 962 F. 2d. 263 (2nd 1992)   In this case, the Government is seeking a modification of an essential element of the crime charged.

### Possession of a Firearm in the Conspiracy to Commit a Robbery–Count Three 18 USC 924 c) and Possession of a Firearm in the Conspiracy to Commit a Robbery during which Robbery a Person was Shot and Killed Count Two 18 USC 924(j)

Neither of these charges can stand without a viable conviction to the first count of the Indictment.  Your Honor properly charged the jury on pages 10-11 of the Jury Instructions that an acquittal under Count One requires the jurors to find the defendant Not Guilty of Counts Two and Three.  (TT p. 1142)

## POINT II

### Comments made by the Court and the Government During the Defense Summation Impermissibly Shifted the Burden of Proof from the Government to the Defense

During defense counsel's summation, the defense properly argued that 1) the Government's failure to call Detective Christopher Killen of the 32nd Precinct and 2) the lack of telephone records that would have corroborated the testimony of the cooperator witnesses.  The defense made this argument in the context of the expected and given Court charge of "the lack of evidence" in the case.

An example regarding the phone call was the testimony of Ramos that he made several phone calls to Pop (Austin) shortly after the crime ((TT p. 752).  Also, Mitchell testified that numerous phone calls were made to Ramos after the incident from a liquor store on 151st Street.  (TT p. 289).  Cooperating witness Austin claimed that shortly after the incident he received a

phone call from Raheen and Mitchell (TT p. 581)   All of these phone calls, if made, could have been corroborated by telephone records and the Government's failure to produce such records was clearly something that the jury could have considered when determining the credibility of the cooperating witnesses.  Instead, the Government objected to the defense comment about phone records and the Court improperly sustained the objection.

> Mr. Dinnerstein: And then you remember how the government's witnesses talked about cell phones, that people made phone calls to one another after the incident, before the incident and other dates.  Common sense tells you that cell phones have records. Where are those records?  The Government has to prove the case beyond a reasonable doubt.  If there were cell phone records that helped their case, they'd be here.
>
> Ms. Lemire: Objection.
>
> The Court: Sustained.  The defense has the same right to subpoena cell phone records as the Government.
>
> (TT p. 1099)

Such a comment by the Court is unfair.  First, while the defense has the "right" to subpoena cell phone records, under these circumstances, the defense would have no idea what cell phone records to subpoena since only the cooperating witnesses will be able to say what actual phones were used[5].  Therefore, the defense was certainly not in the same position as the Government to uncover these records, if they existed[6].  Also, since the Government had the burden of proof, the Court's comment suggests that the defendant has the burden of proof. Under these circumstances, the defense must also prove a "negative", that is, that phone calls did

---

[5] If the defendant did subpoena some cell phone belonging to a cooperator who is to say that he was not using someone else's phone at the time.

[6] It was of course the defense position that no such calls were made and that the witnesses were lying about them.

not exist. To suggest otherwise, as the Court does, places a burden on the defendant, which is clearly improper and warrants the Rule 33 remedy to grant a New Trial.

Correspondingly, in response to Detective Killen, it is simply unfair to suggest that Killen is equally available to both sides in anything but a technical sense. Detective Killen is the chief investigator in the prosecution of this case. He was the chief investigating detective, present at the initial interview of the King murder of each of the cooperating witnesses, played a major role in conversations with witness Mercy Ramos, attended most of the proffer sessions in this case and interviewed extensively the defendant Raheen Davis. At the very least, it would be reasonable to expect that such a witness would be called by the Government, even if the defense could conceivably impeach this obvious hostile witness in light of Fed. Rule of Evid. 607. For the defense to call such a witness clearly in the Government camp would be a strategic landmine and for the Court and the Government to suggest otherwise defies reason and common sense.

The Government and Court comments further "shift the burden" of proof to the defense implying that "any lack of evidence" argument places an affirmative duty on the defendant to call the witnesses that are clearly under the control of the Government.

The Second Circuit, while reluctant to overturn a conviction on this ground, has not had a fact pattern where the Court seemed to condone the Government's error. USA v. Cruz. 797 F. 2d 90 (2nd Circ., 1986). In Cruz, the Court ruled that although the Government's comments were improper (the Government argued that the defendant had to convince the jury), the Court provided curative instruction. In the instant case, the Court, did not provide such instruction. In fact, the Court informed the jury that the defendant did have an affirmative duty. (TT p. 1099)

As to Detective Killen, the Court instructed the jury that "I instruct you that Mr.

13

Dinnerstein and his client have the same right to call Detective Killen as the government and was free to do so" (lines 4-6).  This instruction fails to address the valid defense argument that the case detective is in the pocket of the prosecutor and to inform the jury that the defense is in an equal position to introduce this witness is unreasonable and unfair.  Moreover, the instruction further asserts that the defendant has a "burden of proof" that prevents him from arguing that the Government was clearly in the best position to call this witness and that the failure to do so is fair comment.  See, USA v. Parker, 903 F. 2d 91 (2nd Circ. 1990).   In fact, the Court's instruction makes a factual finding that the defense was in an equal position as the Government to call Killen.  While the Court declined to grant the defendant's request for a "Missing Witness Charge" See, Sand, ¶ 6.04 Inst. 6-5, it enhanced that objection by finding that the case detective was equally available to the defense because of their "right" to subpoena Killen.  Calling a witness who clearly is an adversary is not often a good strategic decision.  Under all of these circumstances, the Court's comments improperly shifted the burden to the defense.

   Correspondingly, the Court's comment regarding the telephone records are also shifting the burden to the defense.  The Court instructed the jury during the defense summation that  "the defense had the same right to subpoena cell phone records as the government" (TT 1099, lines 20-21)  This is simply factually untrue.  The defense did not have access to the telephone numbers that belonged to the Government cooperating witnesses.  In fact, the Government did apparently subpoena numerous phone records and even intended to call a witness to authenticate the records.  It is obvious that the records did not support the position that phone calls were made between Davis and the cooperating witnesses around the time of the crime.  Such comment by the defense was fair.  The Government's objection should have been overruled and the Court

14

instruction to the jury was erroneous.

## **CONCLUSION**

For the reasons set forth above, Defendant respectfully requests that the Court either (i) enter an order acquitting defendant of Counts I, II and III of the Indictment or, in the alternative, (ii) granting defendant a new trial on Counts I and III.

Dated: New York, New York
June 3, 2008                                                                 Respectfully submitted,

                                                    Mitchell Dinnerstein
                                                    350 Broadway
                                                    Suite 700
                                                    New York, New York 10013
                                                    212-925-0793
                                                    Fax: 212-625-3939

*Attorney on this motion for defendant Raheen Davis*

cc.: John Hillebrecht/Katherine Lemire AUSA

     Raheen Davis

     Michael Kim, Esq.